SEAN HAUGH, AND J. RUSSELL CAPPS, PLAINTIFFS v. COUNTY OF DURHAM, ELLEN W. RECKHOW, CHAIRMAN OF THE DURHAM COUNTY BOARD OF COMMISSIONERS, IN HER OFFICIAL CAPACITY, MICHAEL D. PAGE, VICE-CHAIRMAN OF THE DURHAM COUNTY BOARD OF COMMISSIONERS, IN HIS OFFICIAL CAPACITY; AND LEWIS A. CREEK, PHILLIP R. COUSIN, JR., AND BECKY M. HERON, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE DURHAM COUNTY BOARD OF COMMISSIONERS; MICHAEL M. RUFFIN, DURHAM COUNTY MANAGER, IN HIS OFFICIAL CAPACITY; AND NITRONEX CORPORATION, DEFENDANTS

No. COA09-167

(Filed 7 December 2010)

**1. Jurisdiction— standing taxpayers—challenge to tax incentives**

The trial court erred in concluding that plaintiff Haugh lacked standing to bring suit for alleged violations of the North Carolina Constitution based on tax incentives granted by defendant Durham County to defendant Nitronex Corporation. Haugh averred in the complaint that he is a citizen, resident and taxpayer in Durham County and that he pays various types of taxes to Durham County government, including sales taxes. The trial court did not err in concluding that plaintiff Capps lacked standing because his argument that he had been injuriously affected by

the diminution of Nitronex's contribution toward Wake County's tax base failed.

**2. Taxation— tax incentives—political question doctrine— action not barred**

The trial court did not err in concluding that the propriety of tax incentives similar to those at issue had already been judicially established and that any further review of Durham County's decision as to whether to offer the incentives or the amount thereof was barred by the political question doctrine.

**3. Taxation— authority to tax—Public Purpose Clauses—not violated—bound by prior precedent**

The trial court did not err in granting summary judgment in favor of defendants with respect to alleged violations of the Public Purpose Clauses of the North Carolina Constitution. Incentives parallel to those at issue had already been held to comport to the Public Purpose Clauses of our State Constitution in view of the test articulated in *Madison Cablevision*, 325 N.C. 634, and the Court of Appeals was bound by that precedent.

**4. Taxation— tax incentives—not exclusive emoluments**

The trial court properly granted summary judgment in favor of defendants with respect to purported violations of Article I, section 32 of the North Carolina Constitution. Pursuant to the Court of Appeals' previous holdings in *Peacock*, 139 N.C. App. 487, and *Blinson*, 186 N.C. App. 328, and in view of its holding that challenged incentives offered by defendant Durham County to defendant Nitronex were for a public purpose, the incentives at issue necessarily were not exclusive emoluments.

Appeal by plaintiffs from order entered 9 July 2008 by Judge Howard E. Manning, Jr. in Durham County Superior Court. Heard in the Court of Appeals 2 September 2009.

*North Carolina Institute for Constitutional Law, by Robert F. Orr and Jeanette K. Doran, for plaintiffs-appellants.*

*Durham County Attorney S.C. Kitchen, for County of Durham, defendants-appellees.*

*Wyrick Robbins Yates & Ponton, LLP, by K. Edward Greene and Tobias S. Hampson, for Nitronex Corporation, defendants-appellees.*

JACKSON, Judge.

Sean Haugh ("Haugh") and J. Russell Capps ("Capps") (collectively, "plaintiffs") appeal from the trial court's order granting summary judgment in favor of the County of Durham[1] ("Durham") and Nitronex Corporation ("Nitronex") (collectively, "defendants"). For the reasons set forth below, we affirm in part and reverse in part.

Plaintiffs allege that Haugh is a citizen, resident, and taxpayer in Durham, North Carolina and that Capps is a citizen, resident, and taxpayer in Wake County, North Carolina. Plaintiffs further allege that they each pay "various types of taxes to" their respective counties of residence[2], "including sales taxes." Capps also asserts that he pays real estate taxes to Wake County.

Nitronex is a corporation chartered in Delaware and licensed to do business in North Carolina. From the time of its incorporation in 1999, Nitronex was headquartered in Raleigh, North Carolina. On or about 2 April 2002, Nitronex signed a memorandum of lease as a tenant for real property in Durham ("the Durham property").

In late 2005 and early 2006, Nitronex began searching for locations at which it could expand its operations to include semiconductor manufacturing facilities. Initially, Nitronex considered various locations in Wake County, the Durham property, and various locations in "Silicon Valley," California.

On or about 12 March 2007, the Durham County Board of Commissioners (the "Board") approved entering into an agreement with Nitronex to provide up to $100,000.00 from the Durham County Economic Development Investment Fund over a period of five years "contingent upon a new investment of Twenty-Four Million Dollars ($24,000,000.00), hiring two hundred ten (210) new employees and adding a minimum of Five Million Dollars ($5,000,000.00) in additional business personal property tax listings." Durham offered to pay

---

1. Plaintiffs do not appeal the dismissal of this action against the Durham County Board of Commissioners—Ellen W. Reckhow, Michael D. Page, Lewis A. Cheek, Phillip R. Cousin, Jr., and Becky M. Heron—or Durham County Manager Michael M. Ruffin.

2. We note that Haugh does not aver that he pays taxes to Wake County, and Capps does not aver that he pays taxes to Durham.

$30,000.00 "upon occupancy of the building located at 2305 Presidential Drive, RTP, NC, installation of equipment, and listing of [$5,000,000.00] new business personal property in Durham County; and payment of [$1,000.00] for each Durham County resident hired, up to a maximum of [$70,000.00]." On 22 March 2007, Nitronex announced its intention to relocate its corporate and manufacturing operations to Durham.

On 21 December 2007, plaintiffs filed an unverified complaint alleging violations of the North Carolina Constitution, including Article I, section 32 and Article V, sections 2(1) and 2(7), and seeking a declaration that Durham's resolution, grant, and terms and conditions of the agreement with Nitronex are unconstitutional. On 8 July 2008, the trial court granted summary judgment[3] in favor of defendants and dismissed the action after concluding that (1) plaintiffs lacked standing because they do not pay property taxes to Durham and (2) the court lacked subject matter jurisdiction pursuant to the political question doctrine to rule upon the economic incentives offered by Durham to Nitronex. Plaintiffs appeal.

[1] On appeal, plaintiffs first argue that the trial court erred in concluding that plaintiffs do not have standing to bring suit because neither pays property taxes to Durham. We agree with plaintiffs' assertion that the trial court erred in concluding that plaintiffs lack standing because they do not pay property taxes to Durham; however, we still conclude that Capps does not have standing as he did not allege that he has paid taxes of any kind to Durham.

We review an order allowing summary judgment *de novo*. *Moody v. Able Outdoor, Inc.*, 169 N.C. App. 80, 83, 609 S.E.2d 259, 261 (2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56 (2009). "An issue is 'genuine' if it can be proven by substantial evidence[,] and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citing *Bone International, Inc. v. Brooks*, 304 N.C. 371, 374-75, 283 S.E.2d 518, 520 (1981)). In deciding a motion for summary judgment, a trial court must consider the evidence in the light most

---

3. The trial court's order notes that defendants' motions originally were filed as motions to dismiss, but that the motions previously had been "converted by order of the Court to motions for summary judgment."

favorable to the non-moving party. *See Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003). If there is any evidence of a genuine issue of material fact, a motion for summary judgment should be denied. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 471, 597 S.E.2d 674, 694 (2004). The moving party bears the burden of showing that no triable issue of fact exists. *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985) (citing *Texaco, Inc. v. Creel*, 310 N.C. 695, 699, 314 S.E.2d 506, 508 (1984)).

Furthermore,

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

N.C. Gen. Stat. § 1A-1, Rule 56(e) (2009). Our Supreme Court has explained:

> Subsection (e) of Rule 56 does not shift the burden of proof at the hearing on motion for summary judgment. *The moving party still has the burden of proving that no genuine issue of material fact exists in the case.* However, when the moving party by affidavit or otherwise presents materials in support of his motion, it becomes incumbent upon the opposing party to take affirmative steps to defend his position by proof of his own. If he rests upon the mere allegations or denial of his pleading, he does so at the risk of having judgment entered against him. The opposing party need not convince the court that he would prevail on a triable issue of material fact but only that the issue exists. *See* Shuford, *N.C. Civil Practice and Procedure*, § 56-9 (2d ed. 1981). However, subsection (e) of Rule 56 precludes any party from prevailing against a motion for summary judgment through reliance on conclusory allegations unsupported by facts. *Nasco Equipment Co. v. Mason*, 291 N.C. 145, 152, 229 S.E.2d 278, 283 (1976). And, subsection (e) clearly states that the unsupported allegations in a pleading are insufficient to create a genuine issue of fact where the moving adverse party supports his motion by allowable evidentiary matter showing the facts to be contrary to that alleged in the pleadings.

*Lowe,* 305 N.C. at 370, 289 S.E.2d at 366 (emphasis added) (original emphasis removed).

In the case *sub judice,* in support of their motion with respect to plaintiffs' lack of standing, defendants submitted the affidavit of Kimberly H. Simpson ("Simpson"), Interim Tax Administrator for the County of Durham. Simpson averred that her "position combines the duties of the Tax Collector and Tax Assessor." Furthermore, "as part of [her] duties, [she] oversee[s] the listing and collection of property taxes." "[She] . . . examined the property tax records contained in [her] Office, and neither Plaintiff, Sean Haugh, [n]or Plaintiff, J. Russell Capps, listed property for taxation in Durham County for the tax year 2007, or paid taxes in Durham County for the tax year 2007."

North Carolina law is clear in that the payment of property taxes is a means of establishing taxpayer standing, but that payment of other types of taxes also may be sufficient to establish taxpayer standing. *See, e.g., Goldston v. State,* 361 N.C. 26, 29-33, 637 S.E.2d 876, 879-81 (2006) (holding payment of "motor fuel taxes, title and registration fees, and other highway taxes which by law were collected expressly for application to the Highway Trust Fund" to be sufficient to allow the plaintiffs standing as taxpayers to challenge diversion of funds from the Highway Trust Fund, which was funded by the types of taxes the plaintiffs had paid). In *Goldston,* our Supreme Court reiterated North Carolina's expansive view of standing with respect to taxpayers. 361 N.C. at 28, 637 S.E.2d at 878 (reaffirming the Court's "long-standing holdings that taxpayers have standing to challenge unlawful or unconstitutional government expenditures . . . ."). The Court explained that

> the gist of the question of standing is whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.

*Id.* at 30, 637 S.E.2d at 879 (citations omitted) (internal quotation marks omitted) (brackets omitted). The court noted that it had "recognized as early as the nineteenth century that taxpayers have standing to challenge the allegedly illegal or unconstitutional disbursement of tax funds by local officials." *Id.* at 30-31, 637 S.E.2d at 879-80 (citing *Stratford v. Greensboro,* 124 N.C. 110, 111-12, 32 S.E. 394, 395-96 (1899) (holding that a taxpayer had standing to challenge the con-

struction of a street that was alleged to have been undertaken for the benefit of a private citizen rather than for a public purpose and explaining that "[i]f such rights were denied to exist against municipal corporations, then taxpayers and property owners who bear the burdens of government would not only be without remedy, but be liable to be plundered whenever irresponsible men might get into the control of the government of towns and cities.")). *See also Maready v. City of Winston-Salem*, 342 N.C. 708, 712-13, 467 S.E.2d 615, 618-19 (1996) (explaining that the plaintiff was a citizen and resident of the City of Winston-Salem in Forsyth County, that the plaintiff owned real and personal property upon which the city and county levied property taxes, and that those types of taxes were the "primary source" of funds for the economic incentives the plaintiff challenged); *Blinson v. State*, 186 N.C. App. 328, 334, 651 S.E.2d 268, 273-74 (2007) (explaining that the defendants conceded that, pursuant to *Goldston*, the plaintiffs had standing as taxpayers to bring claims pursuant to the Public Purpose and Exclusive Emoluments Clauses of the North Carolina Constitution based upon the plaintiffs' contention that they would suffer an increased tax burden as a result of the incentives provided in that case), *appeal dismissed and disc. rev. denied*, 362 N.C. 355, 661 S.E.2d 240 (2008); *Peacock v. Shinn*, 139 N.C. App. 487, 489-91, 533 S.E.2d 842, 844-46 (explaining that, together with relevant, accompanying correspondence, the plaintiff's allegation that he was a "resident and taxpayer of the City of Charlotte" was sufficient to survive a motion to dismiss), *appeal dismissed and disc. rev. denied*, 353 N.C. 267, 546 S.E.2d 110 (2000), *reconsideration dismissed*, 353 N.C. 379, 547 S.E.2d 16 (2001).

In support of their motion for summary judgment with respect to standing, defendants only presented evidence that plaintiffs did not pay property taxes to Durham for the 2007 tax year. Therefore, defendants failed to meet their burden pursuant to Rule 56(e) to show that no genuine issue of fact existed as to plaintiffs' standing. *See Lowe*, 305 N.C. at 370, 289 S.E.2d at 366. Accordingly, the trial court erred insofar as it concluded that plaintiffs lacked standing based solely upon proof that neither paid *property* taxes to Durham.

Nonetheless, Capps averred that he "is a citizen, resident and taxpayer in Wake County, North Carolina," and that "[h]e pays various types of taxes to Wake County government, including real estate and sales taxes." Capps argues that he has been injured by Durham's incentives to Nitronex because the purportedly unconstitutional incentives illegally induced Nitronex's move to Durham, which diminished

the tax base in Wake County. Contrary to Capps's argument, the deposition of Charles Shalvoy ("Shalvoy"), C.E.O. of Nitronex, unequivocally explains that, although Nitronex initially had considered staying in Wake County, "relatively early on we concluded that Wake County would not be--would not have the--the facilities that we were looking for compared to alternative facilities that we were looking at in Durham and in Northern California." Shalvoy explained that Nitronex's semiconductor manufacturing facilities required "clean rooms," which were unavailable in Wake County, but which were readily available in Silicon Valley and could be made available in Durham. This uncontroverted deposition testimony demonstrates that Nitronex was prepared to leave Wake County, and its corporate officers were deciding whether to move to Durham or California. Therefore, Capps's argument that he had been injuriously affected by the diminution of Nitronex's contribution toward Wake County's tax base as a result of Durham's incentives fails, and we hold that the trial court's grant of summary judgment against Capps was correct. "If the granting of summary judgment can be sustained on any grounds, it should be affirmed on appeal. If the correct result has been reached, the judgment will not be disturbed even though the trial court may not have assigned the correct reason for the judgment entered." *Shore v. Brown*, 324 N.C. 427, 428, 378 S.E.2d 778, 779 (1989) (citing *Sanitary District v. Lenoir*, 249 N.C. 96, 105 S.E.2d 411 (1958); *Hayes v. Wilmington*, 243 N.C. 525, 91 S.E.2d 673 (1956)). *See also Azar v. Presbyterian Hosp.*, 191 N.C. App. 367, 370-71, 663 S.E.2d 450, 453 (2008). However, unlike Capps, Haugh averred in the complaint that he "is a citizen, resident and taxpayer in Durham, Durham County, North Carolina[,]" and that "[h]e pays various types of taxes to Durham County government, including sales taxes." Defendants presented no evidence to contravene this averment.[4] The only contradiction to this assertion is the bare denial in Durham's Answer. Accordingly, we affirm the trial court's order with respect to Capps's standing, and we reverse the trial court's order with respect to Haugh's standing.

**[2]** Next, plaintiffs challenge the trial court's conclusion that

> Defendant, County of Durham, has awarded economic incentives to Defendant, Nitronex Corporation, through a contract authorized and awarded pursuant to N.C. Gen. Stat. § 158-7.1, which

---

4. Defendants asserted in their motions to dismiss that "Plaintiffs are not taxpayers in the County of Durham . . . ." However, as noted *supra*, defendants only presented evidence addressing plaintiffs' failure to pay property taxes. Defendants presented no evidence regarding plaintiffs' payment or nonpayment of sales taxes.

statute has previously been held to be constitutional by the North Carolina Appellate Courts, and that the Court therefore lacks subject matter jurisdiction under the political question doctrine.

Plaintiffs argue that the political question doctrine does not apply to questions of constitutional interpretation, including inquiries into that which constitutes a public purpose or an exclusive emolument, and therefore, the trial court was not deprived of subject matter jurisdiction. Plaintiffs further contend that their complaint alleges a violation of constitutional safeguards that are fundamental protections of public funds, and therefore, the Courts of this State must determine whether the legislative body's methods are barred by the North Carolina Constitution.

North Carolina General Statutes, section 158-7.1 applies to the actions taken by Durham. Section 158-7.1 provides, in relevant part, that

[e]ach county and city in this State is authorized to make appropriations for the purposes of aiding and encouraging the location of manufacturing enterprises, making industrial surveys and locating industrial and commercial plants in or near such city or in the county; encouraging the building of railroads or other purposes which, in the discretion of the governing body of the city or of the county commissioners of the county, will increase the population, taxable property, agricultural industries and business prospects of any city or county. These appropriations may be funded by the levy of property taxes pursuant to G.S. 153A-149 and 160A-209 and by the allocation of other revenues whose use is not otherwise restricted by law.

N.C. Gen. Stat. § 158-7.1(a) (2007).

In *Maready*, our Supreme Court examined the constitutionality of section 158-7.1, and the majority held that section 158-7.1 did not violate the Public Purpose Clause of North Carolina Constitution, Article V, section 2(1) and that the statute was not impermissibly vague or ambiguous. *Maready*, 342 N.C. at 734, 467 S.E.2d at 631. In the Court's examination of the constitutional questions presented, the Court explained that "[t]he Constitution restricts powers, and powers not surrendered inhere in the people to be exercised through their representatives in the General Assembly; therefore, so long as an act is not forbidden, its wisdom and expediency are for legislative, not judicial, decision." *Id.* at 714, 467 S.E.2d at 619 (citing *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891-92 (1961)). However,

legislative declarations notwithstanding, "[i]t is the duty of this Court to ascertain and declare the intent of the framers of the Constitution and to reject any act in conflict therewith." *Id.* at 716, 467 S.E.2d at 620 (citations omitted). Thus, the Court's explanation of rules relevant to its analysis of the issues presented in that case clearly comports with the well-established contours of the political question doctrine, which " 'excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.' " *Bacon v. Lee*, 353 N.C. 696, 717, 549 S.E.2d 840, 854 (quoting *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230, 92 L. Ed. 2d 166, 178 (1986)), *cert. denied*, 533 U.S. 975, 150 L. Ed. 2d 804 (2001). However, "[i]t is the duty and prerogative of this Court to make the ultimate determination of whether the activity or enterprise is for a purpose forbidden by the Constitution of the state." *Madison Cablevision v. City of Morganton*, 325 N.C. 634, 645, 386 S.E.2d 200, 208.2 (1989) (citing *Foster v. Medical Care Comm.*, 283 N.C. 110, 195 S.E.2d 517 (1973)).

In the case *sub judice*, plaintiffs would have us read separately the portion of the trial court's conclusion that the political question doctrine deprives the court of subject matter jurisdiction as inaccurate and overly broad because fundamental questions of constitutional interpretation remain with the judiciary. We acknowledge such a reading would be a correct statement of the law, *see Maready*, 342 N.C. at 716, 467 S.E.2d at 620, but such a reading is incomplete. The remainder of the trial court's conclusion provides that the statutory authority pursuant to which Durham offered the challenged tax incentives to Nitronex already has been held to be constitutional by North Carolina's appellate courts, which also is a correct statement of the law. *See Maready*, 342 N.C. at 734, 467 S.E.2d at 631; *Blinson*, 186 N.C. App. at 330, 651 S.E.2d at 271; *Peacock*, 139 N.C. App. at 495-96, 533 S.E.2d at 848. Having reviewed the trial court's full conclusion, we understand the conclusion to mean that the propriety of tax incentives similar to those at issue already has been judicially established and that any further review of the relative wisdom of Durham as to whether to offer the incentives or the amount thereof would be barred by the political question doctrine. Accordingly, viewed as a whole, we believe the trial court's conclusion to be a correct interpretation of the relevant rules of law.

[3] Next, plaintiffs argue that Durham's tax incentive for the benefit of Nitronex violates the Public Purpose Clauses of the North Carolina

Constitution or otherwise offers an incentive for a wholly intrastate relocation undertaken five years prior to awarding the incentive. We disagree.

North Carolina Constitution, Article V, section 2(1) provides that "[t]he power of taxation shall be exercised in a just and equitable manner, *for public purposes only*, and shall never be surrendered, suspended, or contracted away." (Emphasis added). North Carolina Constitution, Article V, section 2(7) provides that "[t]he General Assembly may enact laws whereby the State, any county, city or town, and any other public corporation may contract with and appropriate money to any person, association, or corporation for the accomplishment of *public purposes only*." (Emphasis added).

In *Maready*, our Supreme Court upheld allegedly unconstitutional expenditures pursuant to North Carolina General Statutes, section 158-7.1, which included several million dollars awarded to private companies for "on-the-job training, site preparation, facility upgrading, and parking." *Maready*, 342 N.C. at 713, 467 S.E.2d at 619. The Court applied the test set forth in *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207, to determine whether North Carolina General Statutes, section 158-7.1 violated the Public Purpose Clause of North Carolina Constitution, Article V, section 2(1)[5]. *Maready*, 342 N.C. at 722-25, 467 S.E.2d at 624-26. The Court explained that

> [t]wo guiding principles have been established for determining that a particular undertaking by a municipality is for a public purpose: (1) it involves a reasonable connection with the convenience and necessity of the particular municipality; and (2) the activity benefits the public generally, as opposed to special interests or persons.

*Id.* at 722, 467 S.E.2d at 624 (quoting *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207).

The Court held that the economic development incentives at issue satisfied the first prong of the *Madison Cablevision* test because "the activities N.C.G.S. § 158-7.1 authorizes invoke traditional governmental powers and authorities in the service of economic development." *Id.* at 723-24, 467 S.E.2d at 625. The Court

---

5. Although the Court's holding in *Maready* narrowly focused on the Public Purpose Clause set forth in Article V, section 2(1) of the North Carolina Constitution, *see Maready*, 342 N.C. at 734, 467 S.E.2d at 631, the Court noted that the development of the public purpose doctrine in North Carolina, which includes the Public Purpose Clause set forth in North Carolina Constitution, Article V, section 2(7), had led to the test articulated in *Madison Cablevision*.

explained that "[e]conomic development has long been recognized as a proper governmental function[,]" and acknowledged "judicial acceptance of the promotion of economic development as a valid public purpose." *Id.* at 723, 467 S.E.2d at 624-25 (citations omitted).

The Court further held that the incentives at issue satisfied the second prong of the *Madison Cablevision* test because,

> under the expanded understanding of public purpose, even the most innovative activities N.C.G.S. § 158-7.1 permits are constitutional so long as they primarily benefit the public and not a private party. "It is not necessary, in order that a use may be regarded as public, that it should be for the use and benefit of every citizen in the community." *Briggs v. City of Raleigh*, 195 N.C. 223, 226, 141 S.E. 597, 599-600 [(1928)]. Moreover, an expenditure does not lose its public purpose merely because it involves a private actor. Generally, if an act will promote the welfare of a state or a local government and its citizens, it is for a public purpose.

> Viewed in this light, section 158-7.1 clearly serves a public purpose. Its self-proclaimed end is to "increase the population, taxable property, agricultural industries and business prospects of any city or county." N.C.G.S. § 158-7.1(a). However, it is the natural consequences flowing therefrom that ensure a net public benefit. The expenditures this statute authorizes should create a more stable local economy by providing displaced workers with continuing employment opportunities, attracting better paying and more highly skilled jobs, enlarging the tax base, and diversifying the economy. Careful planning pursuant to the statute should enable optimization of natural resources while concurrently preserving the local infrastructure. The strict procedural requirements the statute imposes provide safeguards that should suffice to prevent abuse.

> The public advantages are not indirect, remote, or incidental; rather, they are directly aimed at furthering the general economic welfare of the people of the communities affected. While private actors will necessarily benefit from the expenditures authorized, such benefit is merely incidental. It results from the local government's efforts to better serve the interests of its people. Each community has a distinct ambience, unique assets, and special needs best ascertained at the local level. Section 158-7.1 enables each to formulate its own definition of economic success and to draft a developmental plan leading to that goal. This aim is no

less legitimate and no less for a public purpose than projects this Court has approved in the past.

*Id.* at 724-25, 467 S.E.2d at 625-26.

In *Peacock*, this Court examined two agreements between the Charlotte Convention Center Authority and several parties representing the Charlotte Hornets basketball team that required the Authority to pay directly private parties a percentage of the revenue generated by the Charlotte Coliseum. *Peacock*, 139 N.C. App. at 489-92, 533 S.E.2d at 844-46. The plaintiffs alleged that various portions of the agreements violated the "public purpose" requirements of Article V, section 2 of the North Carolina Constitution as well as the "exclusive or separate emoluments or privileges" provision of Article I, section 32 of the North Carolina Constitution. *Id.* at 492-95, 533 S.E.2d at 846-48. We held that the payments were for "public purposes" pursuant to the *Madison Cablevision* test in view of the Court's holding and instruction in *Maready*, notwithstanding that the private parties would accrue a benefit as a result of the agreements with the Authority. *Id.* at 492-96, 533 S.E.2d at 846-48.

In *Blinson*, we held that incentives authorized by our General Assembly and offered by the City of Winston-Salem and Forsyth County to a computer company—Dell, Inc.—did not violate the Public Purpose Clauses of Article V, sections 2(1) and 2(7) of the North Carolina Constitution. *Blinson*, 186 N.C. App. at 335-41, 651 S.E.2d at 274-78. We examined our holding in *Peacock* and our Supreme Court's holding in *Maready*, and we held that the trial court properly dismissed the plaintiffs' claims because the claims focused on the benefits to Dell rather than alleging that "the legislative bodies were not acting with a motivation to increase the tax base or alleviate unemployment and fiscal distress." *Id.* at 341, 651 S.E.2d at 278. We explained that

> plaintiffs challenge incentives—provided by the General Assembly and defendants City of Winston-Salem and Forsyth County—that benefitted defendant Dell, Inc. when it constructed a computer manufacturing facility in Forsyth County.
>
> Whether these incentives are lawful under the North Carolina Constitution was settled by *Maready* and this Court's subsequent decision in *Peacock v. Shinn*, 139 N.C. App. 487, 533 S.E.2d 842, *appeal dismissed and disc. review denied*, 353 N.C. 267, 546 S.E.2d 110 (2000). We are not free to revisit the reasoning or hold-

ings of those opinions. To the extent plaintiffs question the wisdom of the incentives and whether they will in fact provide the public benefit promised, they have sought relief in the wrong forum. Once the Supreme Court held in *Maready* that economic incentives to recruit business to North Carolina involve a proper public purpose, it became the role of the General Assembly and the Executive Branch—and not the courts—to determine whether such incentives are sound public policy. We are bound by *Maready* and *Peacock* and, therefore, affirm the trial court's decision . . . .

*Id.* at 329-30, 651 S.E.2d at 271.

Plaintiffs appear to attempt to distinguish the case *sub judice* from our holdings in *Peacock* and *Blinson* and our Supreme Court's holding in *Maready* by framing this as a novel case of intrastate competition between adjacent counties and characterizing Durham's action as a reward for consummating a plan Nitronex already had conceived and to which it already had committed. We are not persuaded, and hold that Shalvoy's undisputed deposition testimony contradicts plaintiff's position and places the remaining issues squarely within the purview of holdings that we are not at liberty to revisit. *See Dunn v. Pate*, 334 N.C. 115, 118, 431 S.E.2d 178, 180 (1993) (The Court of Appeals "has no authority to overrule decisions of [the] Supreme Court and [has] the responsibility to follow those decisions until otherwise ordered by the Supreme Court." (citation and internal quotation marks omitted)); *In the Matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.").

Shalvoy's deposition unequivocally demonstrates that, although Nitronex initially had considered remaining in Wake County, the company quickly eliminated the county from discussion due to its lack of necessary clean room facilities. Although Nitronex had leased property in Durham since 2002, the facility was only partially developed, and "still required another two and a half or $3,000,000 worth of investment to finalize the clean room space and the other facilities, so that people could move into it." Shalvoy further explained that

over and above that two and a half to $3,000,000 was an additional three to $4,000,000 of capital equipment, and that would be required for the company to support the company's growth.

Although that additional equipment also would have to be purchased if Nitronex moved to California, relocation to Silicon Valley provided the economic benefits of facilities with existing clean rooms and of "a very vibrant secondhand equipment market" because "some semiconductor companies are—are scaling back or they have excess capacity, and they sell off some of their unnecessary or excess equipment." We note these economic considerations and estimated investment amounts not to engage in a discussion of the propriety of Durham's incentives or to pass on whether the public ever will benefit from the incentives offered—for that is not the province of this Court—but to illustrate that the case *sub judice* is not solely one of intrastate competition between Wake County and Durham. *Cf. Maready*, 342 N.C. at 727, 467 S.E.2d at 627 ("The potential impetus to economic development, which might otherwise be lost to other states, likewise serves the public interest.").

Furthermore, notwithstanding the existence of a lease on a partially complete building in Durham, Nitronex's remaining in North Carolina was not a foregone conclusion. Rather, Nitronex's consideration was relocating to and outfitting a partially completed facility in Durham or moving to readily available facilities with readily available equipment in California. Shalvoy noted that, although "[t]he incentives and the overall support from the County of Durham was a very important factor in that decision," "[i]t would be fair to say there was no single factor that made the decision one way or the other. There were a whole series of different criteria that went into the final decision."

Therefore, plaintiffs' characterization is unavailing, and the case *sub judice* is materially indistinguishable from our holdings in *Peacock* and *Blinson* and our Supreme Court's holding in *Maready*. Here, the incentives offered were to be paid over a period of five years "contingent upon a new investment of Twenty-Four Million Dollars ($24,000,000.00), hiring two hundred ten (210) new employees and adding a minimum of Five Million Dollars ($5,000,000.00) in additional business personal property tax listings." Furthermore, Durham offered to pay $30,000.00 "upon occupancy of the building located at 2305 Presidential Drive, RTP, NC, installation of new equipment, and listing of [$5,000,000.00] new business personal property in Durham County; and payment of [$1,000.00] for each Durham County resident hired, up to a maximum of [$70,000.00]." Given that the incentives clearly were offered in view of economic development, the first prong of the *Madison Cablevision* test is satisfied pursuant to our Supreme Court's holding in *Maready*. *See Maready*, 342 N.C. at

722-23, 467 S.E.2d at 624. With respect to the second prong of the *Madison Cablevision* test, as noted in *Maready*, expenditures "should create a more stable local economy by providing displaced workers with continuing employment opportunities, attracting better paying and more highly skilled jobs, enlarging the tax base, and diversifying the economy." *Id.* at 724, 467 S.E.2d at 625. "Generally, if an act will promote the welfare of a state or a local government and its citizens, it is for a public purpose." *Id.* "While private actors will necessarily benefit from the expenditures authorized, such benefit is merely incidental. It results from the local government's efforts to better serve the interests of its people." *Id.* at 725, 427 S.E.2d at 625-26.

Accordingly, we affirm the trial court's granting of summary judgment in defendants' favor with respect to purported violations of the Public Purpose Clauses of the North Carolina Constitution. Incentives parallel to those at issue already have been held to comport to the Public Purpose Clauses of our State Constitution in view of the test articulated in *Madison Cablevision*, and we are bound by that precedent. *See In the Matter of Appeal from Civil Penalty*, 324 N.C. at 384, 379 S.E.2d at 37.

[4] Finally, plaintiffs argue that the economic development incentives at issue constitute an unconstitutional exclusive emolument. We disagree.

North Carolina Constitution, Article I, section 32 provides that "[n]o person or set of persons is entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services."

In *Peacock*, we explained that "[m]uch of the case law interpreting article I, § 32 addresses challenges to statutes providing exemptions or benefits to certain individuals or select groups." *Peacock*, 139 N.C. App. at 495, 533 S.E.2d at 848. We further explained that,

> [i]n addressing whether a particular statute violates article I, § 32, courts have applied a two-part test to the exemption or benefit: whether, (1) the exemption or benefit is intended to promote the general welfare rather than the benefit of the individual, and (2) there is a reasonable basis for the legislature to conclude that the granting of the exemption or benefit serves the public interest.

*Id.* (citations omitted). We concluded that, because we already had determined that the challenged portions of the agreements at issue "promote[d] the public benefit by means of optimum use of the

[Charlotte] Coliseum[,]" "the benefit was given in consideration of public services, intended to promote the general public welfare," rather than "for a private purpose, benefitting an individual or select group." *Id.* at 496, 533 S.E.2d at 848.

In *Blinson*, we explained that "[i]n *Peacock*, this Court held that when legislation is determined to 'promote the public benefit' under the Public Purpose Clauses, it necessarily is not an exclusive emolument." *Blinson*, 186 N.C. App. at 342, 651 S.E.2d at 278 (quoting *Peacock*, 139 N.C. App. at 496, 533 S.E.2d at 848). We concluded that we need not address whether the incentives and subsidies at issue were "in consideration of 'public services' " because we already had "concluded that the disputed incentives and subsidies were not exclusive emoluments[.]" *Id.* at 342, 651 S.E.2d at 278-79 (citations omitted).

Pursuant to our previous holdings in *Peacock* and *Blinson,* and in view of our holding that the challenged incentives in the case *sub judice* are for a public purpose (*i.e.*, " 'promote the public benefit' ") as contemplated by our Supreme Court's interpretation of the Public Purpose Clauses of the North Carolina Constitution, we hold that the incentives at issue "necessarily [are] not . . . exclusive emolument[s]." *Blinson*, 186 N.C. App. at 342, 651 S.E.2d at 278 (quoting *Peacock*, 139 N.C. App. at 496, 533 S.E.2d at 848). *See also In the Matter of Appeal from Civil Penalty*, 324 N.C. at 384, 379 S.E.2d at 37. Accordingly, we hold that the trial court properly granted summary judgment in defendants' favor with respect to purported violations of Article I, section 32 of the North Carolina Constitution.

For the foregoing reasons, we reverse the trial court's order with respect to Haugh's standing, and we affirm the remainder of the trial court's order.

Affirmed in Part; Reversed in Part.

Judges McGEE and STEELMAN concur.